## MARIANA JAREMILLO *v*. JOSE DE LA CRUZ ROMERO.

ABSENCE OF RETURN OF SERVICE, PRESUMPTION FROM.—Where no return of service of process appears in a cause in a justice's court, the presumption is that there was no service, though the justice states in his transcript on appeal, that the summons was returned served.

WANT OF SERVICE, OBJECTION TO, IN APPELLATE COURT.—The objection that the defendant was not served with process can not be raised in the appellate court, after a trial on the merits in the court below.

PEONS, WHO ARE.—Strictly speaking, peons are a class of servants in New Mexico, bound to personal service for the payment of debts due their masters, but there seems to be no law regulating their rights and duties under that specific denomination, and the term "peon" is now used as synonymous with "servant."

MASTER AND SERVANT, LAW OF, DISCUSSED.—The history of the law of master and servant in New Mexico is very fully given in the opinion of Benedict, J.

RELATION OF MASTER AND SERVANT, MATTER OF CONTRACT.—The relation of master and servant in this territory is a matter of mutual contract, and such contract may be entered into by any free persons, where there is no legal impediment.

ALCALDE, JURISDICTION OF, UNDER KEARNY CODE.—Alcaldes, under the Kearny code, were substantially justices of the peace, having no powers beyond those expressly conferred upon them.

ALCALDE COULD NOT PROCEED SUMMARILY AGAINST FUGITIVE SERVANT.—Under the Kearny code, an alcalde had not power to issue summary process to compel the return of a peon or other servant who had left his master's service while in debt to him; but the master was left to recover his debt from his servant in the same way as from an ordinary debtor.

PREFECT'S JURISDICTION AS TO MASTER AND SERVANT.—The jurisdiction given to prefects by the Kearny code extended to all controversies between masters and servants.

PREFECT'S EX PARTE ADJUDICATION NOT BINDING.—Under the Kearny code, a prefect had no power upon an *ex parte* application, without notice to the adverse party to adjudge or certify that the latter was a fugitive servant, indebted to his master in a certain sum, which he was bound to pay by his services, or in money, and such certificate, if given, is no evidence of the facts therein contained.

CHILD NOT BOUND TO SERVE FOR FATHER'S DEBT.—A child can not be held bound, without his own consent, to serve a third person in payment of his father's debt beyond his minority.

REMEDY FOR SERVANT'S VIOLATION OF CONTRACT.—Under the law of 1852, a servant refusing to comply with his contract may be punished by fine and imprisonment, and judgment, in due course of law, may be rendered against him for any indebtedness due his master, and his services may be sold on execution to the highest bidder, to satisfy said judgment.

JUDGMENT THAT DEFENDANT SERVE AS A PEON, VOID.—In such a case, upon giving the master judgment for his debt, a further judgment, that the defendant serve the plaintiff as a peon till the debt be paid, is void.

APPEAL from the first judicial district. The opinion states the case.

*M. Ashurst,* for the appellant.

*H. N. Smith,* for the appellee.

By Court, BENEDICT, J.:

This is an appeal from a justice of the peace to the district court in the first district, and from thence to this court. It has become our duty for the first time in this tribunal to examine and construe the laws of this territory, declaring the rights and defining the relations of masters and servants. Like all questions arising out of a domestic relation, the present involves interests important and delicate. It includes what is commonly called the peon system of this country. It is that system to which we so frequently see reference (and sometimes in high places in our republic) as maintaining here similar relations between masters and servants as are found to be established between the master and his slave in different states of the union. It will be expected, perhaps, that the action of this court in this cause will elucidate what this system really is, and we may be

permitted to remark, that each member of this bench has heard and investigated this case with a deep solicitude not to lessen nor render insecure any law or remedy that by just authority exists amongst the inhabitants of this territory in behalf of either master or servant. This solicitude has been more keenly felt as we have reviewed the present condition of the laws, the courts, and the administration of justice in New Mexico, and called to mind a period under a former government in this country when no degree of tolerable certainty existed in judicial forms, proceedings, and decisions, and when the laws and their just benefits·were so often set aside or crushed under foot by prejudice, corruption, or passion—by interest, power, and despotism. We are fully aware how naturally and easily in the minds of many then and now living, have come down from that period notions greatly rigorous as to the power of the master over his servant, and how quickly the former is alarmed as to the retention of his supposed power. These and other obvious considerations will, we doubt not, serve to suggest an explanation for the length of this opinion in this peculiar cause, and the endeavor to illustrate the matters brought within its scope.

This suit seems to have been commenced by summons in the ordinary form. Yet the justice describes Mariana as a servant who had abandoned the work or service of her master while owing the sum of fifty-one dollars and seventy-five cents, before advanced to her. The transcript shows that at the time of trial Mariana did not appear, and that, upon the motion of the plaintiff, the justice rendered judgment against Mariana for twenty-six months of work as a servant, *o el equivalente,* fifty-one dollars and seventy-five cents, *in dinero* (or for fifty-one dollars and seventy-five cents, the equivalent in money), as also for interest and all costs. In the district court the case was tried *de novo,* and the court adjudged "that the plaintiff recover of the said defendant, Mariana Jaremillo, and of Domingo Fernandez Luz Jaremillo and Juan Miguel Ortego, the securities on her appeal bond, the sum of fifty-six dollars and twenty-one cents; and also the costs of this suit to be taxed, and in default of pay-

ment hereof that she be held to serve her said master, Jose de la Cruz Romero, as a peon until said sum of money is paid." The error assigned by the appellant is this judgment, to reverse which she has appealed to this court. Her counsel have insisted in argument that no service of process was made upon her in the suit before the justice, and that she was not brought within his jurisdiction. He states in his transcript that the summons was returned as served, but it does not appear that the serving officer made any return. The statute provides that "any constable or sheriff serving any process authorized by this act shall return thereon, in writing, the time and manner of service, and shall put his name to such return." This was the positive duty of the officer in this case. No such thing seems to have been done, and the presumption of law is that he would have made such return had he served the process. His return would be better evidence of the facts than the justice's minutes. From the unscrupulous disregard which too often prevails in justices' courts in this country as to the legal rights of the unfortunate, the peon and the feeble, when contesting with the influential and more wealthy, as well as the circumstances which appear to have attended this cause before the justice, the painful but reluctant conviction is forced upon our minds that no service of process or notice was made upon Mariana; that the proceedings were wholly *ex parte*, an outrage upon law, and a premeditated injustice; and we derive gratification in marking from this high place, and in this authoritative manner, with the seal of judicial condemnation, such gross violations of the rights of those who are feeble in their own defense. But let the fact have been as it may, as to the service of process, it can avail the appellant nothing here in the determination of her cause. The record does not show that she availed herself of her first opportunity in the district court, to require its judgment upon this point. Had she done so, as the case stood, the court doubtless would have dismissed the suit. She appeared by counsel and contested the merits of the cause. No exhibition of exception to the rulings of the court appears in the record, and it is now too late for her to

ask any favor at the hands of this court, growing out of the defective proceedings of the justice.

Upon the entry of the power of the United States within this territory in 1846, and establishing their rule and government, there was found a large class of persons commonly designated in the language of the country by the name of peons. They were not of any particular color, race, or caste of the inhabitants. · They appeared as servants, menials, or domestics, "bound" to some kind of "service" to their masters. Generally they had none or small amounts of property. The most wealthy and powerful families were flattered in their pride in displaying their retinues of these dependants. Many had been raised from childhood within the households of such families. One fact existed universally: all were indebted to their masters. This was the cord by which they seemed bound to their masters' service. It was an invariable rule, that the peon could discharge himself from this service by the payment of his indebtedness to his master, and the latter never supposed he had any right to refuse to receive his pay from his peon, and still hold him to service. It was common for persons desiring to engage in their employ as servants those owing, as peons, their masters, to advance to them the amounts due, and upon payment to the satisfaction of the old master, the peon left him and went to the service of the new; and these, as by voluntary contract, regarded the labor of him who had the peon's position as pledged for the payment of the money which had been advanced to pay his former master, as also for any other advancement. Upon entering the new service, or while continuing therein, the peon was held rigorously to fulfill his pledge and render his labor so long as his debts remained, or an additional one was incurred. He could not abandon the service; and if he did, his master pursued, reclaimed, and reduced him to obedience and labor again; and the alcaldes of the country, in the most summary manner, aided the master in bringing back his fugitive. Both male and female became peons, and the price of their labor was variously estimated at from one to six dollars per month.

We turn now to inquire for the legislative act which established these rules between peon and master. Vassals and vassalage had ceased to exist under the Spanish monarchy, and had not been restored by the Mexican government. The cortes of Spain, on the sixth of August, 1811, decreed that "the titles of vassals and vassalage are abolished, and also the grants, as well real as personal, which have taken their origin from this title of jurisdiction, except those proceeding from voluntary contracts, in the free exercise of the sacred use of property." In the same manner all contracts, agreements, and conventions which may have been made in consideration of advantage, rents, or annuities of land, or others of this kind, entered into between the so-called lords and their vassals, ought in future to be considered as contracts made between private individuals. Upon careful examination of all the authorities within our present reach, we have been unable to find any law creating and defining the duties and rights, the civil and domestic relations, under the specific denomination of peon, while the Spanish and Mexican laws and authorities are replete with rules clearly marking out the legal rights and duties of masters and servants. If we turn to the lexicographers, we find Mr. Webster, in his dictionary, defines the word peon to mean, in Hindoostan, a foot soldier; in France, a common man; in chess, written and called pawn. From him we learn nothing as to its meaning in Spain or Mexico. In the Spanish and English dictionary by Velasquez, peon is defined variously; such as, pedestrian, day laborer, foot soldier, pawn in chess, anything that is whirled round in play, hive of bees, servant, menial, and groom. It also says that the word, as used in America, means an Indian hired to work by the day. From the last definition of "an Indian hired to work," it is suggested that the condition of a peon originated in Mexico, in the workings of the system of *repartimientos*, or distributions of certain sections of country, including the native inhabitants, made by the early Spanish conquerors among their comrades and followers.

Escriche, in his Diccionario Legislativo, understood to

be received throughout Spain and all the nations upon this continent speaking the Spanish language, as of the very highest authority, says, in the Madrid édition, published in 1847, in vol. 1, p. 184, "that the rights and duties attached to the condition of master and servant, depend entirely upon contract." The obligation of the respective parties to abide faithfully by the agreement, will be found under the head *Amo* (master) to be lucidly and accurately defined. It will be seen that without lawful cause the servant could not leave his master during the time the contract was to endure, and if he should, he might be compelled to return, or pay the damages caused by his abandonment. Under the head of *arrendamiento* it is said, that hiring to personal service is a contract which obligates one of the parties to do something for another, in consideration of a certain price. The most frequent contracts of hiring and leasing of personal labor are those made with persons in the character of servants, domestics, or dependants, who obligate themselves at day labor; that is to say, at so much per day, and for that reason they are called day laborers, such as reapers, workers in vineyards, load carriers, diggers, etc.

In White's Recopilacion, vol. 1, pp. 201, 202, it is said: "The second onerous contract is that of renting, by which one person lets or grants to another person the service of his person or beast, or the use or enjoyments of a thing for a certain time." This contract, then, consists in three things: in the consent of the parties; in the thing or labor which is rented or let; and in the price. Renting derives its perfection from consent. The renter is obliged to perform the labor stipulated. Any one may rent who can sell and buy, the agreement being for a certain time, or for the life of either of the contracting parties. This contract admits every covenant or part that may not be opposed to the laws and good customs.

Schmidt's Civil Law of Spain and Mexico designates unlawful objects of contracts to be such as murder, robbery, adultery, etc., and acts contrary to decency and good morals, as the going naked in the streets, and also the sale of a man's liberty, although he may sell his services for a limited

time: pp. 113, 114. As to the hiring and letting of work and labor, page 170, he says: "The object of this contract extends only to such work as is not considered liberal industry. No one is permitted to hire his personal industry, except for a fixed object and determinate period. The obligation of a workman to furnish his labor expires on his death, and his heirs are not bound to continue it or to finish the work he may have begun."

These quotations are sufficient to manifest the general principles upon which the conditions of master and servant were formed where the Spanish law prevailed. It will not be denied that they extended to Mexico when she achieved her independence. It is seen that the consent of the parties was invariably the foundation upon which a servant became bound to service. When Mexico became an organized republic of states, some of them legislated upon this relation, especially detailing the legal consequences which should flow therefrom, and also prescribing the modes by which the agreement might be perfected. This legislation serves to illustrate the Mexican spirit upon this subject, discloses the state of menial service then existing, and will aid in strengthening our views when we come to examine the act of the assembly of this territory upon the same matters.

On the thirtieth of September, 1828, the congress of Coahuila and Texas passed a decree, clear and pointed. It begins by assuming that the relations of masters and servants were existing within those two states, and says: "Debts contracted by hired servants with their masters previous to the publication of this law, shall be paid in the same manner and form they have bargained." White Recopilacion, 525. We see in this how carefully the congress guarded against the violation of the obligations of previous contracts. All was preserved in manner and form as bargained. The decree then proceeds to regulate for the future: "In future when a servant obtains employment, the contract he makes with his master shall be set down at the head of the account, wherein shall be manifested the manner he is to pay the debt he contracts. The agreement shall be authenticated by two witnesses and signed by

the same, the master, the servant, if he can write, or another person in his name. Amounts ministered to servants in part payment for their labor shall be in money or effects, not exceeding the ordinary prices of the market, and both master and servant shall be entirely free, the one to accept and the other to furnish. In future no payment shall be made in advance to exceed what the servant can obtain as the reward of labor with the whole of one year's wages. The master shall show the servant his account as often as requested; and the latter may sue the former before the alcalde when he thinks himself aggrieved by illegality or any other cause.

"In haciendas, agricultural ranches, or any other establishments situated out of towns, masters, superintendents, and stewards are hereby authorized to punish servants who fail in the faithful fulfillment of their duties or disobey their superiors, by arrest not exceeding four days, or with shackles for the same length of time. When the master enters a complaint to the alcalde on account of the incorrigibility of the servant, the alcalde may punish him with shackles or other correctional penalties to cause him to return to his duty."

Such were the chief articles of that decree, and without doubt were based in the main upon the general custom and practice then prevailing. The makers of the decree clearly manifest that they intended, among other things, carefully to provide to the master's hands, the legal means by which he could compel the servant, under pains and chastisements, to remain in his master's service, obey him, and render him his labor. The use of the whip for correcting servants was forever prohibited, and the servant could sue the master for excessive chastisement. When we turn to the legislative acts of this territory, we find that the assembly held in 1851, under the organic act, made a law, very full in its provisions, upon the subject of the relations of masters and servants. It says, "that all contracts celebrated between two or more persons, the one binding himself to labor in certain and determined employments, or all those contracted for, and the other offering his money in determined daily,

monthly, or yearly salary, shall be respected and enforced by the civil law according to the agreements made by their own free and voluntary will. Fathers of families are permitted to bind out their children to serve only when their poverty demands it, devoting what they draw on account of their salaries to the support of their own legal families. They can not do so when the amount is more than that which is due them at the end of one year. If the servant does not wish to continue in service for any cause, such as the ill-treatment of the master, and receiving better pay from another, or from any other cause that he may assign, on the payment of the amount yet due he can not be bound to continue in service; but if he does not pay, he shall be bound. All free men and women not embarrassed by law or other reasonable causes preventing the fulfillment thereof, may celebrate this species of contract. The prefects, alcaldes, and justices of the peace shall indiscriminately authenticate the books of accounts between masters and servants, according to their jurisdiction. All persons having servants may advance them on account, when they may demand it, two thirds of their salary in order to support their families." With these there are many other provisions defining the legal consequences which flow from the contract when the parties have entered upon its performance. There is also a section in these words: "When a servant runs off, his master may present himself before any authority and take out a warrant of his debt (or, as it is in the Spanish, in which this law was written, *a sacar testimonio de la deuda*), and with it may proceed in person or otherwise to any part of the territory and make his claim, which shall be attended to according to law."

At this point we turn to an examination of the record in this cause, and the matters to be especially determined. There is no bill of exceptions embodying the evidence before the court below, but it has been conceded by the counsel for both parties in this court that the cause was submitted on two certain documents now found transcribed in the record, and which in this court are treated by both parties as the only evidence upon which the judgment of the

court below was based and the decision of this tribunal is now asked. As to the sufficiency of the evidence to sustain the judgment appealed from, these documents, carefully translated, are as follows:

"Territory of New Mexico, County of Santa Fe.

"The citizen, Francisco Ortiz y Delgado, prefect of the county of Santa Fe, do certify, as fully as I am permitted by law, that the citizen, Jose de la Cruz Romero, of the county of Bernalillo, has personally appeared before me, claiming a servant of his who was taken from his service by her father, Jose Jaremillo, without his consent. The servant's name is Mariana Jaremillo, and the sum claimed by her master is fifty-one dollars and seventy-five cents ($51.75), and in order that the party interested may demand his servant or his money from her father, who is the person who brought her away, I give him the present document.

"In Santa Fe, May 21, 1849.

"(Signed)          FRANCISCO ORTIZ Y DELGADO."

"Territory of New Mexico, County of Bernalillo.

"To the Hon. Prefect and Hon. Alcaldes of the county of Santa Fe: Jose de la Cruz Romero has represented in this office that his servant, Mariana Jaremillo, has abandoned his service, owing him the sum of fifty-one dollars and seventy-five cents, and that he is credibly informed that said servant is in Santa Fe, and the party interested asks of the undersigned justice of the peace letters requisitorial (*exhorto*) for the apprehension of said servant, which the present judge extends, requesting all authorities to be pleased to order that the said servant be delivered to her master, or return to him the amount she owes him. In so doing I will remain obliged to do the same when I receive a similar request from you.

"Ranchos, June 5, 1849.

"[SEAL]          (Signed)          AMBROSIO ARMIGO."

Now these documents were issued more than two years before the master and servant act of July, 1851, became a law. They are supposed to have been regarded at the time as writs carrying authority with them, but it does not

seem they were ever executed.   Do the writs or documents amount to proof establishing the contract binding Mariana to service, the terms and her indebtedness?

In 1846, the political relations of this country were changed from Mexico to the United States.   The president of the latter, by virtue of a power well settled as existing in him, assumed the exercise of political authority over this territory.   Through General Kearny he proclaimed laws, established offices, prescribed their functions, and appointed officers to fill and perform the duties of the offices.   Their powers and jurisdiction were defined, and he directed the manner these should be exerted.   Among the grades of officers were alcaldes.   These were officers previously well known in the country; though called alcaldes, they were, under the Kearny code, substantially justices of the peace. It is a rule of construction applicable to such officers that they have no power beyond that expressly conferred upon them.   They derive no general jurisdiction.   The acts creating them and clothing them with authority fix and limit the bounds, beyond which an alcalde's acts are null. In the well-defined powers given him in the code, there was nothing special as to master and servant.   The same course of proceeding was left a master to recover his debt from his servant or peon, as in the ordinary way from another debtor, nor was any summary process provided, when the peon had left his master's service, to compel him to return.   The mode of summoning a debtor was plainly marked out, as also every succeeding step to be taken in the cause, and the alcaldes were bound to conform thereto.   There was no *fuero* left to them to adopt and exert old Mexican processes against one class of debtors when the political system then in force had imposed upon them a new, different, and less harsh system of judicial proceedings.   It conformed to the design and spirit of our government, when she possessed herself of this region and created her courts, to so arrange their practice as to secure the inhabitants against all arbitrary will and judicial despotism.

Appreciating this fact, it is hardly fair to conclude that it was intended that there should be left in the hands of the

alcaldes the faculty of using the cast-off and summary processes of a superseded government alone against him whose fate was that of an indebted laborer and servant, and that, too, when the Kearny code had made no discrimination against him. The jurisdiction given to the prefects was different. It extended to all controversies between masters and those bound to them, and he had the power of binding out apprentices. Whether the controversies mentioned included those which might arise between masters and bound apprentices only, or also between master and servant, seems to be unimportant in this inquiry. The prefect of Santa Fe, as it appears by the certificate made by him, stated that Romero had presented himself before him claiming a servant, that her name was Mariana, and that her father had taken her from his service, and that there was due him the sum of fifty-one dollars and seventy-five cents. The purpose of the process or document was to assist Romero in demanding the money or girl of her father. Nothing shows that either the girl or her father was ever before the prefect to adjust the accounts or claims with Romero, or that any notice had been given either to appear. By what practice, then, principle or law, could Mariana be bound by the prefect's proceedings? Had he formally rendered a judgment against her, could it be introduced to establish a debt against her? She was no party to the transaction, had no opportunity to defend against the demand, and, neither expressly nor constructively, had been brought within the prefect's jurisdiction. To hold that such judgment possessed any force, that it proved anything against Mariana or her father, would be setting at open defiance the known and long-observed rules of evidence and opening the doors to irresistible and measureless wrongs and frauds.

If, then, the judgment itself could not be received as evidence, how could a mere certificate upon the same amount to proof of her indebtedness, her being bound to service by her own or her parent's consent, and the terms, in a suit commenced against her several years afterwards? If the going to the prefect by Romero and making his *ex parte*

representations, adjudicated Mariana's case with him, proved her a debtor and bound to service, and has given a master a right to reclaim or reduce her to bondage, it is easy to perceive how any person whosoever within the territory. may be made a debtor and sent into servitude, should an unscrupulous man and an ignorant and faithless prefect or probate judge devise mischief together. But it is said that prefects, alcaldes, or justices of the peace shall indiscriminately authenticate the books of accounts between masters ` and servants. This is a section before quoted, and dates in 1851. The provision is a wise one, and in the hands of competent and honest officers promotes fairness and justice. By authentication here is meant the giving of legal faith to some act or thing, a formal attestation, the giving authority by necessary formalities. What is essential to enable the officer to do this, as to master and servant? The parties must be present by themselves or agents. It is not a trial; it is a mutual agreement of the parties as to the contract or account. The magistrate is the official witness and he attests the facts agreed upon. He affixes thereto his legal formalities, and authenticates and gives faith to the transaction. This furnishes proof of the contract or account, subject to be attacked and overcome by showing fraud, error, mistake, force, or any of the facts which vitiate and make void or voidable contracts and accounts, or relieve parties from the legal consequences of their own admissions. In the cause at bar there is no proof of any mutual adjustment between the parties before any magistrate, nor does any certify to the correctness of any accounts owed by Mariana. Nothing appears beyond the representations made by Romero. The paper issued by the prefect says that Mariana's father had brought her away, and the document was given in order that Romero might demand his servant or money from her father. So far as this shows anything, it suggests strongly that the debt, if any, was due by the father, and not the girl. He took control of his daughter, and Romero obtained the action of the prefect against him. The inference is patent that the girl was a minor, and, if held for a debt, it was her father's. How

could a girl, able to work as a servant, become indebted to
Romero fifty-one dollars and seventy-five cents beyond the
fair value of her services? Should it likely be on her own
account? It is nearly eight years since the prefect issued
his document. If the debt was made upon her own ac-
count, it must have originated when she was not much more
than a child, and for what consideration could she have
bound herself at such an age for such a sum? If it was
upon her father's account, as doubtless it was, she has
passed, it may be well inferred, beyond her minority, and
if so, can not, against her own consent, be held bound to
service by reason of her father's indebtedness.

We think proper, in this place, to notice the further legis-
lation of this territory upon the subject of master and ser-
vant. In 1852 an act provided as follows:

Section 1. All contracts, voluntarily entered into between
masters and servants, agreeing and designating the kind of
service, the salary, and the time such service shall continue,
whether any money shall have been given or received in ad-
vance or not, both parties shall be compelled to comply with
the contract without power to rescind it, except in the follow-
ing cases: 1. By mutual consent; 2. For sufficient motive
having been given by one party to the other, such as hav-
ing grievously injured him; 3. If the master keeps the ac-
counts in an ambiguous manner, so that the servant can not
understand them. In these three cases the contract may
be rescinded by paying the amount due from one party to
the other, as the case may be; but if such motives should
not be proven, the contract shall be complied with, and the
judge or court of any precinct shall order it to be carried
into effect, imposing upon the party failing to comply with
the contract, and who shall persevere in doing so, that he
indemnify the other party for the injuries resulting there-
from, or which may follow; and all resistance shall be pun-
ished by fine or imprisonment, as the gravity or circum-
stances of the resistance in the case may require; the party,
furthermore, being obliged to pay the costs of the trial in
the case.

Sec. 2. If a servant shall refuse to comply with the

contract, and he should owe any part of the money to the master, and he refuses or can not pay it, the justice of the peace, judge of probate, or district court will compel him to pay *numerata pecunia* the entire principal and legal interest for all the time it may remain unpaid, it being the duty of the judge or court, in case of difficulty, to order the sheriff to contract the services of said person to the highest bidder for the purpose of recovering the debt. The same proceeding shall be had when the master owes the servant any sum of money for services rendered, and shall refuse to pay him for the same.

Sec. 3. Those offenses committed by servants maltreating their masters or mistresses shall be punished for the same by the justices of the peace or court in which the suit may be brought, with imprisonment for a time demanded by the gravity of the offense.

We see in this section the exertions of the legislature to make more strict and multiply the remedies for the enforcement of these descriptions of contracts. They modify in some respect the act of 1851. By that the servant could leave his master whenever he willed by paying his debt. By this he must abide by and fulfill his agreement according to its terms, whether he owes or does not owe, pays or does not pay. Unless he can get his master's consent to rescind or prove some one of the causes specified to procure a cancellation, he may be prosecuted for a failure, and so may the master, and the servant compelled to a compliance by a fine and imprisonment. It seems strange the act fixed no limits to the power of the magistrate in unmistakable terms, and that so much discretion should be conferred upon the court or judge. It appears clear that the legislators were determined that by no means should either of the parties escape the consequences of their own voluntary engagements. Again, the act follows the servant with other measures, more rigid and direct upon his person, if he refuses a compliance with his contract and owes his master any sum and refuses to pay, or is even unable to pay it. It defines how he may be sued for the debt and judgment obtained in the course of a legal proceeding, and, in

pursuance of an execution, his services sold by the sheriff to the highest bidder to raise the means to pay the debt. No authority is given the tribunal in this course to adjudicate the servant to the master upon giving the latter judgment for his debt.

We find here no support to that portion of the judgment of the district court which adjudged Mariana to the service of Romero as a peon, in default of her or her securities paying the money. The compulsory process of fine and imprisonment in case the servant refuses to perform his agreement, and the extent to which it may be exerted, to enforce obedience, would seem to furnish ample means to secure him to service. A still further remedy is added in the proceeding. The master may proceed in the ordinary form for the collection of his debt, and in the execution for the sale of the servant's services. The act is in some respects loose and indefinite in its language, yet not so much so that an intelligent court can not find the rule for its guidance.

The great importance which attaches to the subject-matter we have considered, has, among other things, induced a general reference to the laws and enactments which authorize, regulate, and enforce, and to the authorities that illustrate the system of service between masters and servants in this territory. This system we find to be the peon system of the country, yet in all our searches we see nowhere the term peon in any of the legislation touching the party bound to service. In all instances where we might expect to find it we invariably find servant. In the common use of language the term peon is now used in this country as synonymous with servant. Personal interests to a wide extent have been and still continue interwoven with this system. It is seen to be carefully regulated by the legislature; that the relation of master and servant is formed by mutual contract only; that all free men and women, when no legal impediment exists, may celebrate this species of contracts; that parents can not contract away the services of their children, except in certain specified cases; that the parties, in the first place, may agree upon the kind of serv-

ice, the duration, and the pay; that the service of the servant becomes bound to his master for an indebtedness founded upon an advancement made in consideration of service; that the servant can not leave his master's service during the time embraced in the contract, unless he proves some one of the two causes to exist, mentioned in the statute, or shall obtain his master's consent, and shall pay what he owes him; that if he shall refuse to serve in conformity with the contract, he may be compelled to its fulfillment by the magistrate with the chastisements of fine and imprisonment; that the master may procure summary proceedings before the judicial officer to enforce compliance; if the servant is a parent, and dies, the children are not compelled to serve in his stead; that the contract may be entered into before judges of probate or justices of the peace, who shall authenticate or attest the same, as they also may accounts between the parties. A peon or servant loses none of his rights as a citizen by contracting with a master to serve him. He is under no political disqualifications; he votes at all elections if otherwise legally qualified; his servitude does not render him under our laws ineligible to the offices of the precinct, the county, the legislature, or delegate in congress.

Such are some of the features which the peon system (as commonly called) presents in this territory. In pronouncing upon the testimony in the cause we are required to determine, we are of opinion that the writ *exhorto*, or letters requisitorial, possessed no legal force as evidence of indebtedness from Mariana to Romero. It was issued by Don Ambrosio Armigo, as alcalde, after the government of the United States had defined and limited the jurisdiction of alcaldes, and prescribed to them their modes of procedure, and before the passage of the master and servants act of July, 1851. No debt was established against Mariana by the *ex parte* action of Romero before the alcalde. The process or certificate of the prefect of Santa Fe can not prove her bound to service, nor her indebtedness. It professes to certify that Romero represented that Mariana, or her father, was owing him. No notice or summons was

given the girl, neither actual nor constructive. She seems in no form to have been brought within the prefect's jurisdiction. All was *ex parte.* These two writs, certificates, or documents were the only evidence offered or considered in the district court. Their utter insufficiency to prove Mariana's contract of service or any indebtedness to Romero, on her part, obligates this court to reverse the judgment of the court below, with costs against Romero.