The ALMA SOCIETY INCORPORATED, Joyce Aaron, Eleanor B. Barron, Marilyn Louise Beck, Susan Roberta Brody, John Franklin Filippone, Anne Fosby, Ronnye Jacovitz Futrell, Rolande Synge Hampden, Michael Jay Hatten, Vincent Konola, Katrina Maxtone-Graham, Anita McCarthy, Raymond Rand, Rosemarie Smith, Joan Sommers, Clothilde Louise Starke, Robert Van Laven, Hope Herman Wurmfeld, and Karl M. Zimmer, Appellants,

v.

Irving MELLON, Director of Vital Records, City of New York, Richard J. Garofano, Village Clerk, Mount Kisco, New York, Beverly La Tona, City Clerk, City of Dunkirk, New York, the Honorable Millard L. Midonick, Surrogate, New York County, the Honorable Bertram L. Gelfand, Surrogate, Bronx County, the Honorable Bernard M. Bloom, Surrogate, Kings County, the Honorable Louis D. Laurino, Surrogate, Queens County, the Honorable John D. Bennett, Surrogate, Nassau County, the Honorable Ernest L. Signorelli, Surrogate, Suffolk County, the Honorable Louis B. Scheiman, Surrogate, Sullivan County, Louise Wise Services, Spence-Chapin Services to Families and Children, Children's Aid Society (Child Adoption Service), Jewish Child Care Association of New York, and New York Foundling Hospital, Appellees.

No. 666, Docket 78–7593.

United States Court of Appeals, Second Circuit.

Argued March 19, 1979.

Decided June 22, 1979.

.. 

Gerald E. Bodell, Bodell & Magovern, New York City, for appellee New York Foundling Hospital.

Leonard F. Manning, Professor of Law, New York City, for appellee Jewish Child Care Association.

Donald J. Cohn, Webster & Sheffield, New York City (David A. Hom, New York City, of counsel), for appellee The Children's Aid Society.

Stephen Wise Tulin, Polier, Tulin & Clark, New York City, for appellee Louise Wise Services.

Allen G. Schwartz, Corp. Counsel, New York City (L. Kevin Sheridan and Carolyn E. Demarest, New York City, Lillian Gewirtz and Peter Lavigne, law clerks, of counsel), submitted a brief for appellee Irving Mellon.

Ephraim London, London & Buttenwieser, New York City (Helen L. Buttenweiser, New York City, of counsel), for court-appointed law guardian.

Before LUMBARD and OAKES, Circuit Judges, and BRIEANT, District Judge.*

OAKES, Circuit Judge:

This appeal presents the question whether adopted persons upon reaching adulthood ("adult adoptees") are constitutionally entitled, irrespective of a showing of cause, to obtain their sealed adoption records, including the names of their natural parents. Appellants are adult adoptees and an association of such persons; and they urge that the New York statutes that require the sealing of adoption records[1] are facially

Cyril C. Means, Jr., Professor of Law, New York City (Bertram E. Hirsch, New York City, of counsel), for appellants.

Charles Brody, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen. of the State of New York, New York City), for appellees Surrogates Midonick, Gelfand, Bloom, Laurino, Bennett, Signorelli, and Scheiman.

* Of the Southern District of New York, sitting by designation.

1. The statutes are N.Y.Dom.Rel.Law § 114, providing for the sealing of court records pertaining to adoption unless "good cause" is shown; N.Y.Pub. Health Law § 4138, providing for new birth certificates in the case, *inter alia,* of an adoption and destruction after microfilming or sealing of the original certificate; and N.Y.Soc.Serv.Law § 372 providing for confidentiality of public and agency records pertaining to abandoned, delinquent, destitute, neglected, or dependent children. The statutes in pertinent part are set out below.

N.Y.Dom.Rel.Law § 114:

If satisfied that the best interests of the adoptive child will be promoted thereby the judge or surrogate shall make an order approving the adoption and directing that the adoptive child shall thenceforth be regarded and treated in all respects as the child of the adoptive parents or parent. . . . Such order shall contain the full name, date and place of birth and reference to the schedule annexed to the petition containing the medical history of the child in the body thereof and may direct that the child's medical history be furnished to the adoptive parents. . . . Such order and all the papers in the proceeding shall be filed in the office of the court granting the adoption and the order shall be entered in

invalid on Fourteenth Amendment Due Process and Equal Protection grounds and on the further basis that those statutes impose upon them badges or incidents of

books which shall be kept under seal and which shall be indexed by the name of the adoptive parents and by the full original name of the child. Such order, including orders heretofore entered, shall be subject to inspection and examination only as hereinafter provided. . . . If the confidentiality is violated, the person or company violating it can be found guilty of contempt of court. . . .

No person, including the attorney for the adoptive parents shall disclose the surname of the child directly or indirectly to the adoptive parents except upon order of the court. No person shall be allowed access to such sealed records and order and any index thereof except upon an order of a judge or surrogate of the court in which the order was made or of a justice of the supreme court. No order for disclosure or access and inspection shall be granted except on good cause shown and on due notice to the adoptive parents and to such additional persons as the court may direct.

N.Y.Pub. Health Law § 4138:

1. A new certificate of birth shall be made whenever:

. . . . .

(c) notification is received by, or proper proof is submitted to, the commissioner from or by the clerk as aforesaid of a judgment, order or decree relating to the adoption of such person. Such judgment, order or decree shall also be sufficient authority to make a new birth certificate with conforming change in the name of such person on the birth certificate of any of such person's children under the age of eighteen years whose record of birth is on file in the state health department . . . . .

. . . . .

3. (a) When a new certificate of birth is made the commissioner shall substitute such new certificate for the certificate of birth then on file, if any, and shall send the registrar of the district in which the birth occurred a copy of the new certificate of birth. The registrar shall make a copy of the new certificate for the local record and hold the contents of the original local record confidential along with all papers and copies pertaining thereto. It shall not be released or otherwise divulged except by order of a court of competent jurisdiction.

(b) Thereafter, when a verified transcript or certification of birth of such person is issued by the registrar, it shall be based upon the new certificate, except when an order of a court of competent jurisdiction shall require the issuance of a verified transcript of certification based upon the original local record of birth.

4. The commissioner may make a microfilm or other suitable copy of the original certificate of birth and all papers pertaining to the new certificate of birth. In such event, the original certificate and papers may be destroyed. All undestroyed certificates and papers and copies thereof shall be confidential and the contents thereof shall not be released or otherwise divulged except by order of a court of competent jurisdiction.

5. Thereafter, when a certified copy or certified transcript of the certificate of birth of such a person, or a certification of birth for such person is issued, it shall be based upon the new certificate of birth, except when an order of a court of competent jurisdiction shall require the issuance of a copy of the original certificate of birth.

. . . . .

7. Whenever the commissioner makes a new birth certificate for any person pursuant to the provisions of subdivision one of this section, he shall forward to such person, if eighteen years of age or more, or to the parents of such person, either a certificate of registration of birth or a certification of birth, whichever he deems appropriate under the circumstances, without making any charge therefor.

N.Y.Soc.Serv.Law § 372:

1. Every court, and every public board, commission, institution, or officer having powers or charged with duties in relation to abandoned, delinquent, destitute, neglected or dependent children who shall receive, accept or commit any child shall provide and keep a record showing:

(a) the full and true name of the child,

(b) his sex and date and place of birth, if ascertainable, or his apparent age,

(c) the full and true names and places of birth of his parents, and their actual residence if living, or their latest known residence, if deceased or whereabouts unknown and the name and actual residence of any other person having custody of the child, as nearly as the same can reasonably be ascertained,

(d) the religious faith of the parents and of the child.

(e) the name and address of any person, agency, institution or other organization to which the child is committed, placed out, boarded out, or otherwise given into care, custody or control,

(f) the religious faith and occupation of the head or heads of the family with whom the child is placed out or boarded out and their relationship, if any, to the child.

(g) if any such child shall die, the date and cause of death and place of burial,

(h) any further disposition or change in care, custody or control of the child,

slavery in violation of the Thirteenth Amendment. The United States District Court for the Southern District of New York, Milton Pollack, Judge, dismissed appellants' complaint against representative record keepers and surrogates represented by the State of New York and certain adoption agencies or societies. *Alma Society, Inc. v. Mellon,* 459 F.Supp. 912 (S.D.N.Y. 1978). We affirm.[2]

Appellants argue that adult adoptees should be given access to the records of their adoptions with no showing of cause whatsoever. Their supporting affidavits, which we must take as true for present purposes, indicate that lack of access to such records causes some of them serious psychological trauma and pain and suffering, may cause in them or their children medical problems or misdiagnoses for lack of history,[3] may create in some persons a consciousness of danger of unwitting incest, and in others a "crisis" of religious identity or what they feel is an impairment of religious freedom because they are unable to be reared in the religion of their natural parents. Appellants point out that only in the last fifty years has New York had sealed adoption records,[4] that Scotland and Israel have had open records for some

---

(i) the date or dates of reception and of any subsequent disposition or change in care, custody or control and, in case of adoption, the name and title of the judge or surrogate making the order of adoption, the date of such order and the date and place of filing of such order,

(j) the reasons for any act performed in reference to such child herein required to be recorded, together with such further information as the department may require; and shall make to the department upon blanks provided by the department reports of each such child placed out, or boarded out, containing the information herein required to be kept; and shall furnish such information to any authorized agency to which any such child shall be committed or otherwise given into custody.

3. Upon application by a parent, relative or legal guardian of such child or by an authorized agency, after due notice to the institution or authorized agency affected and hearing had thereon, the supreme court may by order direct the officers of such institution or authorized agency to furnish to such parent, relative, legal guardian or authorized agency such extracts from the record relating to such child as the court may deem proper. The department through its authorized agents and employees may examine at all reasonable times the records required by this section to be kept.

4. All such records relating to such children shall be open to the inspection of the board and the department at any reasonable time, and the information called for under this section and such other data as may be required by the department shall be reported to the department, in accordance with the regulations of the department. Such records kept by the department shall be deemed confidential and shall be safeguarded from coming to the knowledge of and from inspection or examination by any person other than one authorized, by the department, by a judge of the court of claims when such records are required for the trial of a claim or other proceeding in such court or by a justice of the supreme court after a notice to all interested persons and a hearing, to receive such knowledge or to make such inspection or examination. No person shall divulge the information thus obtained without authorization so to do by the department, or by such judge or justice.

6. The provisions of this section as to records and reports to the department shall apply also to the placing out, adoption or boarding out of a child and the acceptance of guardianship or of surrender of a child.

2. Appellees Children's Aid Society and Louise Wise Services argue that we should invoke the doctrine of abstention under (1) *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed. 669 (1971), and progeny (2) under *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and (3) because this is a domestic relations matter. We disagree for the reasons so well stated by Judge Pollack, and we do not repeat his opinion. *See Alma Society, Inc. v. Mellon,* 459 F.Supp. 912, 914–15 (S.D.N.Y.1978).

3. In *Rhodes v. Laurino,* 601 F.2d 1239, handed down herewith, such a claim is made.

4. From 1873 to 1924 adoption records in New York were public. Several states still grant the adoptee access to original birth certificates, *e. g.,* 16 Ala.Code § 26–10–4 (1975); 14A Fla.Stat. Ann. § 382.22 (West Supp.1978); 5 Kan.Stat. § 65–2423 (1972); or to the court records of their adoption. 9 S.D. Compiled Laws Ann. § 25–6–15 (1977).

time,[5] and that England and Wales have recently changed from closed to open records with access to adults who have obtained a certain age.[6]

The attack upon the New York statutes is three-fold. Appellants first argue that the interest of an adult adoptee in learning from the State (or from agencies acting under compulsion of state law) the identity of his natural family is a fundamental right under the Due Process clause of the Fourteenth Amendment. "This section affords not only a procedural guarantee against the deprivation of 'liberty,' but likewise protects substantive aspects of liberty against unconstitutional restrictions by the State." *Kelley v. Johnson,* 425 U.S. 238, 244, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976); *see Castaneda v. Partida,* 430 U.S. 482, 503 n. 2, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (Marshall, J., concurring) (recognizing impact of discrimination on "sense of self"). *See also Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (impact of housing ordinance on family relationship).

Second, appellants argue that adult adoptees constitute a suspect or "quasi-suspect" classification under the Equal Protection clause of the Fourteenth Amendment.[7] Under this view semi-strict or intermediate scrutiny of the New York statutes would be appropriate, and appellants maintain that such a review does not indicate that the statutes are based on sufficiently important state interests.

Finally, appellants argue that the Thirteenth Amendment also applies to this case because the statutes that require sealing of the adoption records as to adults constitute the second of the five incidents of slavery—namely, the abolition of the parental relation—listed by Senator James Harlan of Iowa in a speech made during the deliberations on the Thirteenth Amendment. *See* 1 B. Schwartz, *Statutory History of the United States: Civil Rights* 71, 72 (1970). Furthermore, appellants say none of the exceptions to the Thirteenth Amendment[8] covers

5. Scotland for 48 years, Adoption of Children (Scotland) Act 1930, 20 & 21 Geo. V, c. 37, § 11(8) (adoptee at age 17); Israel for 18, Adoption of Children Law 5720–1960, No. 45, § 27(3), 14 Laws of the State of Israel 93, 97 (1960) (adoptee at age 18).

6. The Children Act, 1975, c. 72, §26 (adoptee at age 18), amending the Adoption Act, 1958, 7–8 Eliz. II, c. 5, § 20(5). *See* Levin, Tracing the Birth Records of Adopted Persons, 7 J.Fam.L. 104 (1977).

7. Appellants speak in terms of a "suspect class," relying on *Trimble v. Gordon,* 430 U.S. 762, 767, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977) (illegitimacy "analogous to" suspect class, but not sufficiently so as to require "our most exacting scrutiny"), and arguing that the sealed records laws treat them worse than illegitimates. *See also Mathews v. Lucas,* 427 U.S. 495, 505, 506, 510, 95 S.Ct. 431, 50 L.Ed.2d 297 (1976); *Craig v. Boren,* 429 U.S. 190, 210–11, 97 S.Ct. 451, 50 L.Ed.2d 397 n. * (1976) (Powell, J., concurring). Professor Tribe has put it:

Although indicating that he "would not welcome a further subdividing of equal protection analysis," Justice Powell, concurring in *Craig v. Boren,* acknowledged that "[t]here are valid reasons for dissatisfaction with the 'two-tier' approach that has been prominent in the Court's [equal protection] decisions in the past decade," and added that "candor compels the recognition that the relatively deferential 'rational basis' standard of review normally applied takes on a sharper focus when we address a gender-based classification." The Justice might well have added that a growing range of cases, involving classifications other than gender and involving a number of important but not "constitutionally fundamental" interests, have likewise triggered forms of review poised between the largely toothless invocation of minimum rationality and the nearly fatal invocation of strict scrutiny—intermediate forms of review which Justice Powell must have had in mind when he spoke of "sharper focus."

L. Tribe, *American Constitutional Law* § 16–30, at 1082 (1978) (footnotes omitted).

8. There are at least six recognized exceptions. The Amendment itself describes the first punishment for crime. *Robertson v. Baldwin,* 165 U.S. 275, 282, 17 S.Ct. 326, 329, 41 L.Ed. 715 (1897), cites three others; the "service" exceptions include sailor's contracts, military and naval service, and "the right of parents and guardians to the custody of their minor children or wards." The fifth exception is "the obligations . . . of an apprentice to his master." *Bailey v. United States,* 219 U.S. 219, 243, 25 S.Ct. 429, 49 L.Ed. 7 (1911); *Clyatt v. United States,* 197 U.S. 207, 216, 25 S.Ct. 429, 49 L.Ed. 726 (1905). The sixth is compulsory work on public roads. *Butler v. Perry,* 240 U.S. 328 (1916).

appellants as adults. Under appellants' view, the rights that the Thirteenth Amendment guarantees are not subject to balancing but are instead protected absolutely. We will discuss each of appellants' three arguments in turn.

*Substantive Due Process*

What appellants assert is a right to "personhood."[9] They rely on a series of Supreme Court cases involving familial relationships, rights of family privacy, and freedom to marry and reproduce.[10] As they put it, "an adoptee is someone upon whom the State has, by sealing his records, imposed lifelong familial amnesia . . . injuring the adoptee in regard to his personal identity when he was too young to consent to, or even know, what was happening." The district court considered that intrusions on privacy are justifiable in the public interest, 459 F.Supp. at 916, but that the natural parent has a countervailing right of privacy and right to be let alone, *citing Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1300, 22 L.Ed.2d 557 (1969). The court also referred to the right of privacy of the adopting parents, presumably referring to "the disruption caused by locating their adoptive child's natural parents." 459 F.Supp. at 916.

We could readily take a "pigeon-hole" approach and in doing so, because appellants' novel claims do not fit into any as yet recognized category of "privacy," exclude them. For example, there is not involved a general "individual interest in avoiding disclosure of personal matters," *Whalen v. Roe,* 429 U.S. 589, 599, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977). Although it could be argued that appellants do have an "interest in independence in making certain kinds of

important decisions," *id.* at 599–600, 97 S.Ct. at 876 [11] that categorization still would leave the question whether in a situation involving both natural parents and adoptive parents the adult adoptee should have "independence" in determining whether he or she shall obtain knowledge of the natural parents. So, too, with a categorization of privacy as including "repose, sanctuary, and intimate decision," *see Comment, A Taxonomy of Privacy: Repose, Sanctuary, and Intimate Decision,* 64 Cal.L.Rev. 1447 (1976), or incorporating the rather vague concepts of "autonomy," "intimacy," and "identity." *See* Gerety, *Redefining Privacy,* 12 Harv.C.R.C.L.L.Rev. 233, 236, 268 (1977); *see generally* L. Tribe, *American Constitutional Law* § 15–2 (1978).

We think that it advances analysis, however, to examine more closely the character of the choices and information that we are asked to treat as special and the factual framework of the decision that we are asked to render. *See id.* § 15–1, at 887. We note, of course, that we are dealing with the "family" in general and with two families in particular—first, the natural parent(s) who has (have) surrendered custody of the adoptee child to the State and in turn an agency or other family, and second, the adopting family which has, presumably nurtured the child to the age of adulthood. The adoptee's attainment of majority is a definite event in the adoptee's life; but it occurs independent of either the legally terminated natural family relationship or the legally assumed adoptive one and does not affect termination or continuation of those relationships. The information sought is information as to the identity of the real parent(s) that was concealed from one and

---

**9.** The term "personhood" originated with Professor Freund as an alternative to "autonomy" or "privacy" and was in turn adopted by the late Judge Craven of the Fourth Circuit. *See* Craven, *Personhood: The Right to be Let Alone,* 1976 Duke L.J. 699, 702 & n. 15.

**10.** The cases are collected in I N. Dorsen, P. Bender & B. Neuborne, *Emerson, Haber & Dorsen's Political and Civil Rights in the United States,* ch. XII, § A (4th ed. 1976); II N. Dorsen, P. Bender, B. Neuborne & S. Law, *Emerson,*

Haber & Dorsen's Political and Civil Rights in the United States, ch. XXXIII (4th ed. 1979).

**11.** The Court enumerated these decisions in *Paul v. Davis,* 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405 (1976), as "matters relating to marriage, procreation, contraception, family relationships, and child rearing and education." Appellants presumably base their claim on "family relationships."

all upon adoption as a matter of law and that may indeed have been a consideration in the willingness of the real parent(s) to give up the child for adoption. With this factual background two recent Supreme Court cases have a bearing upon our deliberations.

The first of these is *Quilloin v. Walcott*, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978). There the appellant, the natural father of an illegitimate child, sought to prevent the husband of the child's mother from adopting the child although the natural father had never attempted to legitimate the child who had always been in the mother's custody. The Court held that the application of a "best interests of the child" standard did not violate appellant's substantive rights under the Due Process Clause. The Court noted its recognition that the relationship between parent and child is constitutionally protected, referring to *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); and *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). It also noted its own recognition in *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944), that "the custody, care and nurture of the child reside first in the parents." The Court expressed "little doubt" that the State's attempt "to force the break up of a natural family, over the objections of parents and children, without some showing of unfitness" would violate the Due Process Clause, *citing Smith v. Organization of Foster Families for Equality & Reform*, 431 U.S. 816, 862–63, 97 S.Ct. 2094, 2119, 53 L.Ed.2d 14 (1977) (Stewart, J., concurring). But the Court emphasized that "the result of the adoption in this case is to give full recognition to a family unit already in existence, a result desired by all concerned, except appellant." 434 U.S. at 255, 98 S.Ct. at 555.

Of course *Quilloin* is distinguishable from the case at bar because there a natural father who had never sought nor had actual or legal custody of a child was seeking to prevent adoption, while here the child himself—now an adult—is seeking information. But the relevance of the case is the Court's "full recognition [of] a family unit already in existence." *Id.* And even though appellants are adults we must assume that they are still part of their adoptive families, families still in existence as to each of them which might be adversely affected by the release of information as to the names of natural parents or the unsealing of the adoption records. At least it would seem that there is an interest on the part of the *adopting* parents that is of recognized importance, one that however, they surely can waive if they see fit to do so.[12]

In *Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978), the second recent case, a majority of the Court held that the right to marry, a "fundamental" interest under the Equal Protection Clause, was abridged by a statute requiring court permission to marry where the applicant has minor issue not in his custody and whom he is under obligation to support. The "right to marry" was said to be "of fundamental importance for all individuals," 434 U.S. at 384, 98 S.Ct. at 679, and "part of the fundamental 'right of privacy' implicit in the Fourteenth Amendment's Due Process Clause." *Id.* The Court quoted the references in *Griswold v. Connecticut*, 381 U.S. 479, 486, 85 S.Ct. 328, 13 L.Ed.2d 339 (1965), to marriage as "coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred" as well as "an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects." Thus the Court held in *Zablocki* that the decision to marry was "among the personal decisions protected by the right of privacy." 434 U.S. at 384, 98 S.Ct. at 679. *See also Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 639–40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974) ("freedom of personal choice in matters of marriage and

---

**12.** We note that N.Y.Dom.Rel.Law § 114, *supra* note 1, requires that a court acting upon a request for disclosure shall notify the adoptive parents of the proceedings.

family life is one of the liberties protected by the Due Process Clause"). The *Zablocki* Court went on to say:

> The woman whom appellee desired to marry had a fundamental right to seek an abortion of their expected child . . or to bring the child into life to suffer the myriad social, if not economic, disabilities that the status of illegitimacy brings . . .. Surely, a decision to marry and raise the child in a traditional family setting must receive equivalent protection.

*Id.* 434 at 386, 98 S.Ct. at 681.

 Again although *Zablocki* is not directly pertinent to this case, it does recognize that we must look to the nature of the relationships and that choices made by those other than the adopted child are involved. Under all the applicable precedents, the State may take these choices into consideration and protect the natural mother's choice of privacy which not all have forsaken even if appellants are correct, as we are told, that many mothers would be willing in this day and age to have their adult adopted children contact them.[13] So, too, a state may take into account the relationship of the adopting parents, even if, as appellants assert, many of them would not object to or would even encourage the adopted child's seeking out the identity of or relationship with a natural parent. The New York statutes in providing for release of the information on a "showing of good cause" do no more than to take these other relationships into account. As such they do not unconstitutionally infringe upon or arbitrarily remove appellants' rights of identity, privacy, or personhood. Upon an appropriate showing of psychological trauma, medical need, or of a religious identity crisis—though it might be doubted upon a showing of "fear of unconscious incest"— the New York courts would appear required

under their own statute to grant permission to release all or part of the sealed adoption records.[14]

*Equal Protection*

Appellants begin their equal protection analysis with the argument that adult adoptees are a suspect classification (and the correlative argument that the State has no compelling interests to support the validity of the sealed records laws). Appellants refer us to *Trimble v. Gordon,* 430 U.S. 762, 766, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977), where the Court stated that classifications based on illegitimacy fall in a "realm of less than strictest scrutiny" although the scrutiny "is not a toothless one." [15] By the citation of *Trimble,* appellants suggest that they are at least entitled to the same level of constitutional scrutiny as illegitimates who have been termed a "sensitive" or quasi-suspect category for which the appropriate level of scrutiny is "intermediate," not "strict," *see* L. Tribe, *supra* §§ 16-30, -31. But appellants cite us to no case holding that *adoptees* are a "sensitive" or quasi-suspect classification. Instead they argue that because the overwhelming majority of adoptees adopted by nonrelatives are illegitimate and because, they say, the State actually treats adoptees *worse* than nonadopted illegitimates, who at least know who their natural mothers are or were and often their natural fathers as well, strict scrutiny is the applicable standard of analysis under the Equal Protection Clause. Of course, as Professor Gunther has said, scrutiny that is " 'strict' in theory" is usually "fatal in fact," *Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv.L.Rev. 1, 8 (1972). Second, appellants argue for application of "strict scrutiny" on the basis of suspect classification status under the Thirteenth Amendment on the theory that "[a]ny group upon which a State imposes

---

**13.** Appellants cite to us one study indicating that 128 out of 152 natural families selected at random agreed to meet an adult adoptee. Jones, The Sealed Adoption Record Controversy: Report of a Survey of Agency Policy, Practice and Opinion (1975).

**14.** The courts concededly have done so from time to time.

**15.** The *Trimble* Court was referring to the standard of scrutiny set forth in *Mathews v. Lucas,* 427 U.S. 495, 505, 506, 510, 95 S.Ct. 431, 50 L.Ed.2d 397 (1976).

. . . a badge or incident of slavery is *ipso facto* also a suspect category under the Equal Protection Clause."

We are not persuaded that strict or even intermediate scrutiny is the appropriate standard of review in this case. Appellants' second strict scrutiny argument requires little discussion. The Supreme Court has been loathe to expand the list of traits subject to this most rigorous level of review,[16] and we are confident that the Court would not include a trait simply because it is a "badge or incident of slavery." Here, indeed, we cannot even conclude that the State has subjected appellants to such a "badge or incident," as the subsequent section of our opinion explains.

Appellants' first argument for strict scrutiny, although more plausible, is also flawed. Simply because most adult adoptees are allegedly illegitimates, it does not follow that adoptees are subject to the same level of constitutional scrutiny as illegitimates, much less a greater level.[17] Moreover, there is a more fundamental, structural defect in the argument that discrimination between adult adoptees (who gain access to their adoption records only upon good cause) and non-adopted illegitimates (who will usually have ready access to the information that adoption records contain) is quasi-suspect. When a court decides that a classification is suspect or quasi-suspect, it has concluded that the State has employed a questionable trait to distinguish those whom the law should burden from those whom the law should not. Here, however, the distinguishing trait between adult adoptees and nonadopted illegitimates, the allegedly similarly situated classes, is not illegitimacy—indeed, *both* of these classes are largely comprised of illegitimates, according to appellants. The trait, rather, is adopted status.

Appellants present no arguments in favor of treating classifications by adopted status as even quasi-suspect, entitled to an intermediate level of judicial scrutiny. Discrimination against illegitimates is generally so treated because of the illogic and injustice of stigmatizing a child in order to express disapproval of the parents' liaisons. *Mathews v. Lucas,* 427 U.S. 495, 505, 95 S.Ct. 431, 50 L.Ed.2d 397 (1976), *quoting Weber v. Aetna Casualty & Surety Co.,* 406 U.S. 164, 175, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972). This rationale is less apposite to discrimination against adopted persons. If adopted persons experience social stigma, it is not as intense or pervasive as illegitimates suffer. Moreover, the present statute notwithstanding, the adopted are not generally subject to extensive legal disabilities and thus have less of a claim to judicial protection than illegitimates.

■ Even assuming that the classification here were subject to intermediate scrutiny,[18] it would not violate equal protection; for we conclude that it is substantially related to an important state interest. *See Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). As noted above, appellants argue that they are similarly sit-

---

16. *See, e.g., Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1919, 36 L.Ed.2d 16 (1973).

17. Appellant's argument appears to invoke disproportionate impact analysis. But the Supreme Court has held, in the context of racial discrimination, that the disproportionate impact of state action upon a suspect class does not, by itself, warrant strict scrutiny. *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Similarly, the disproportionate impact of New York's policy upon illegitimates does not by itself warrant the intermediate scrutiny that an explicit discrimination against illegitimates would justify.

18. In arguing that the adoptees here are an even more "suspect" group than illegitimates, appellants allege that adoptees are treated more unfairly than illegitimates because adoptees do not know their natural parents' identities. To the extent that this argument emphasizes appellants' interest in securing that knowledge, it is better understood as an argument for fundamental interest status than for suspect category status. But we do not believe that such an interest should be considered fundamental, largely for the reasons given in our discussion of the substantive due process argument. Even if the interest is "quasi-fundamental" and subject to intermediate scrutiny, the classification is not invalid, as the text *infra* indicates.

uated to non-adopted illegitimates. By their claim to suspect status, appellants apparently argue in the alternative that adopted persons should be compared to non-adopted persons generally. The question, in either case, is whether the two classes are sufficiently different with respect to an important governmental interest to justify treating the two classes differently.[19] In evaluating this question under the intermediate level of review we must, as in the case of rational basis scrutiny, look to the current articulation of the rationale of the statute as advanced by the appellants themselves, *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 314 & n. 6, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (per curiam); *Johnson v. Robison,* 415 U.S. 361, 376, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974). We must be sure that the rationale advanced is not simply an afterthought supplied purely by hindsight. *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 653, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) (Powell, J., concurring). Rather, we must look to the actual purposes of the statute, *Weinberger v. Wiesenfeld,* 420 U.S. 636, 648 n. 16, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975); *see also Eisenstadt v. Baird,* 405 U.S. 438, 448–49, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), and we must ensure that the individual has the opportunity to rebut any overbroad presumptions that seriously affect the fairness of the scheme. *Craig v. Boren, supra,* 429 U.S. at 199, 97 S.Ct. 451; *Cleveland Board of Education v. LaFleur, supra; Crawford v. Cushman,* 531 F.2d 1114, 1123–26 (2d Cir. 1976).

Judged by these standards, the New York sealed record statutes do not want constitutional validity. The statutes, we think, serve important interests. New York Domestic Relations Law § 114 and its related statutes represent a considered legislative judgment that the confidentiality statutes promote the social policy underlying adoption laws. *See In re Anonymous,* 89 Misc.2d 132, 133, 390 N.Y.S.2d 779, 781 (Surr.Ct.1976). Originally, sealing adoption records was discretionary with the court,

1924 N.Y.Laws, ch. 323, § 113, but in 1938 confidentiality of adoption records became mandatory. 1938 N.Y.Laws, ch. 606 § 114. As late as 1968, the legislature enacted various amendments to increase the assurance of confidentiality. 1968 N.Y.Laws, ch. 1038. Moreover, the purpose of a related statute, Section 4138 of the Public Health Laws, was to erase the stigma of illegitimacy from the adopted child's life by sealing his original birth certificate and issuing a new one under his new surname. And the major purpose of adoption legislation is to encourage natural parents to use the process when they are unwilling or unable to care for their offspring. New York has established a careful legislative scheme governing when adoption may occur and providing for judicial review, to encourage and facilitate the social policy of placing children in permanent loving homes when a natural family breaks up. As the court of appeals stated in *Scarpetta v. Spence-Chapin Adoption Service,* 28 N.Y.2d 185, 195, 321 N.Y.S.2d 65, 73, *cert. denied,* 404 U.S. 805, 321 N.Y. S.2d 65, 269 N.E.2d 787 (1971), "[i]t cannot be doubted that the public policy of our State is contrary to the disclosure of the names and identities of the natural parents and prospective adoptive parents to each other." (Footnote omitted.) Forty-two other states, according to the State of New York, require that birth and adoption records be kept confidential, indicating the importance of the matter of confidentiality. *See also* Uniform Adoption Act (U.L.A.) § 16(2) (rev. 1969) (adoption records "are subject to inspection only upon consent of the Court and all interested persons; or in exceptional cases, only upon an order of the Court for good cause shown"). These significant legislative goals clearly justify the State's decision to keep the natural parents' names secret from adopted persons but not from non-adopted persons.

To be sure, once an adopted child reaches adulthood, some of the considerations that apply at the time of adoption and through-

---

19. *See generally* Note, *Equal Protection: A Closer Look at Closer Scrutiny,* 76 Mich.L.Rev. 771, 774, 814–21 (1978).

out the child's tender years no longer apply or apply with less force. Illegitimacy might stigmatize an adult less than a child, and the goal of encouraging adoption of unwanted and uncared for children might not be significantly affected if *adult* adoptees could discover their natural parents' identities. But the state does have an interest that does not wane as the adopted child grows to adulthood, namely, the interest in protecting the privacy of the natural parents. "[T]he liberty interest in family privacy has its source, and its contours are ordinarily to be sought, not in state law, but in intrinsic human rights . . . ." *Smith v. Organization of Foster Families for Equality & Reform,* 431 U.S. 816, 845, 97 S.Ct. 2094, 2110, 2111, 53 L.Ed.2d 14 (1977) (footnote omitted) (examining the right of a natural family to the return of its child from the care of a foster family). Whether or not the State's interest is "compelling," as the court in *Mills v. Atlantic City Department of Vital Statistics,* 148 N.J.Super. 302, 372 A.2d 646, 653 (Super.Ct. Ch.Div.1977), and the court below, 459 F.Supp. at 917, suggested, it is an important interest, and one which justifies keeping the records confidential regardless of the adopted child's age.

We also believe that the statutory classification is "substantially" related to this interest. To be sure, the law is somewhat overinclusive; for some natural parents undoubtedly would not object to revealing their identities to their children, and some adult adoptees have an extraordinary need for their records that might outweigh their natural parents' need for privacy. But a law does not violate equal protection simply because it results in overinclusion or underinclusion, *i. e.,* some "misfit." The question, rather, is whether the differences between those burdened and those not burdened by a law are substantial enough to justify treating the two classes differently.[20] Here, the legislature has not unreasonably concluded that a larger proportion of the natural parents of adopted children than of non-adopted children would want to keep their identi-

ties private. That is enough to make the statutory classification constitutional.

Moreover, we note that the provision for release of adoption records "on good cause shown" substantially mitigates the possible overbreadth of the statute. The New York courts have granted access for aid in psychiatric or psychological treatment, *In re "Anonymous,"* 92 Misc.2d 224, 399 N.Y.S.2d 857 (Surr.Ct.1977); *In re Maxtone-Graham,* 90 Misc.2d 107, 393 N.Y.S.2d 835 (Surr.Ct. 1975), and for information about genetic conditions. *In re Chattman,* 57 A.D.2d 618, 393 N.Y.S.2d 768 (1977). Thus this case presents an entirely different situation from what it would have if the State permitted no access on any ground. The permitted showing of good cause promotes individualized treatment, a form of structural justice. *See Crawford v. Cushman, supra;* L. Tribe, *supra,* ch. 17. Appellants do not suggest that the New York courts have been overly reluctant to find good cause; we certainly must assume the contrary. Indeed, the cases to which the parties have referred us indicate that some New York courts have appropriately recognized good cause in a variety of circumstances. We find, in short, no basis, even under the intermediate scrutiny standard, for holding that the New York statutes violate the Equal Protection Clause.

### Thirteenth Amendment

Appellants make the novel argument, one concededly not based on the decided cases, that the Thirteenth Amendment's prohibition of slavery and involuntary servitude gives them an *absolute* right to release of their adoption records. Appellants first assert that what rights the Thirteenth Amendment protects it protects absolutely, that is, there is no balancing test and no interest of any kind that can preclude enforcement of the proscriptions where they apply. Second, appellants assert that the Thirteenth Amendment does in fact apply here. The argument is, as we have suggested, that in abolishing slavery and involuntary servitude the Framers also intended

20. *See id.*

to abolish five "necessary incidents of slavery." We address only the second point because we find that the Amendment is entirely inapplicable to this case.

Appellants refer us particularly to the speech of Senator James Harlan of Iowa of April 6, 1864, in which he set forth a number of such incidents. The second named was

> the abolition practically of the parental relation, robbing the offspring of the care and attention of his parents, severing a relation which is universally cited as the emblem of the relation sustained by the Creator to the human family. And yet, according to the matured judgment of these slave States, this guardianship of the parent over his own children must be abrogated to secure the perpetuity of slavery.

1 B. Schwartz, *supra,* at 72. Appellants go so far as to say that the New York sealed record system is "less humane" than New Mexico peonage, under which system a child contracted into peonage ceased to be bound upon obtaining the age of majority, *see Jaremillo v. Romero,* 1 N.M. 190 (1857), because New York adoptees are subject to a "*lifelong* denial of knowledge of their natural origins." Appellants liken their situation also to that of the antebellum South where a slave child was "sold off" while too young to remember his parents and grew up separated from them by inability to communicate as well as by distance. The analogy according to appellants is that however literate they may be, they cannot write to their natural parents, cannot visit them, and thereby wear a "badge or incident" of slavery.

■ This Thirteenth Amendment argument simply does not conform to the Supreme Court's interpretations of the Thirteenth Amendment. The Court has never held that the Amendment itself, unaided by legislation as it is here, reaches the "badges and incidents" of slavery as well as the actual conditions of slavery and involuntary servitude. *See Palmer v. Thompson,* 403 U.S. 217, 226–27, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971); *Jones v. Alfred H. Mayer Co.,*

392 U.S. 409, 439, 440, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); *Plessy v. Ferguson,* 163 U.S. 537, 542, 16 S.Ct. 1138, 41 L.Ed. 256 (1896); *The Civil Rights Cases,* 109 U.S. 3, 20–21, 23, 24, 25, 3 S.Ct. 18, 27 L.Ed. 835 (1883); *The Slaughter-House Cases,* 83 U.S. (16 Wall.) 36, 69, 72, 21 L.Ed. 394 (1873). Indeed, all indications are to the contrary. Notwithstanding Congress's broad authority to legislate under § 2 of the Amendment, *Palmer, supra; Jones, supra; The Civil Rights Cases,* 109 U.S. at 20–21, the Court has directly invoked the Amendment only to strike down state laws imposing the condition of peonage. *See Pollock v. Williams,* 322 U.S. 4, 64 S.Ct. 792, 88 L.Ed. 1095 (1944); *Bailey v. Alabama,* 219 U.S. 219, 31 S.Ct. 145, 55 L.Ed. 191 (1911). Moreover, the Court has indicated that for purposes of judicial enforcement under the express prohibition of the Amendment itself—"[n]either slavery nor involuntary servitude . . shall exist"—the Court will define "slavery" narrowly. *Palmer, supra.* Abolition of the badges and incidents the Court has left to Congress.

■ Appellants do not argue that the denial of complete access to and disclosure of their adoption records constitutes the imposition of slavery or involuntary servitude. Rather, appellants' argument is that "New York's sealed records laws impose upon them [an] incident of slavery" and that "[t]he Thirteenth Amendment . . all by itself and without any aid from an act of Congress abolished and destroyed 'the incidents of slavery.'" The decided cases show that we must reject this absolutist view of the Thirteenth Amendment. Even as the first Mr. Justice Harlan dissented in *Plessy v. Ferguson, supra,* on the ground that the Louisiana statute which required separate railway accommodations for white and black passengers infringed "the personal liberty," 163 U.S. at 557, 16 S.Ct. 1138, guaranteed under the Thirteenth, Fourteenth, and Fifteenth Amendments, he indicated that the Thirteenth Amendment alone could not have required such a result. Although he wrote that the Amendment "prevents the imposition of

any burdens or disabilities that constitute badges of slavery or servitude," *id.* at 555, 16 S.Ct. at 1145, still he did not adopt the absolutist position urged herein. Rather, he stated that the Amendment was "inadequate to the protection of the rights of those who had been in slavery"; and so "it was followed by the fourteenth amendment." *Id.* If the Thirteenth Amendment had by its own force and effect abolished all badges and incidents, all vestiges, of slavery, it would not have been inadequate. So, too, in his dissent in *The Civil Rights Cases, supra,* Mr. Justice Harlan advanced the position not that the Thirteenth Amendment itself had abolished the "burdens [and] disabilities [which] constitute badges of slavery and servitude," 163 U.S. at 555, 16 S.Ct. at 1145, but that Congress had the authority under its power to eradicate the badges and incidents to require equal accommodations.

■ The problem, then, with appellants' argument is that it proves too much. Abolition under the Amendment itself of all of the "incidents" to which Senator Harlan referred would incorporate into the Thirteenth Amendment the privacy interests in the conjugal and parental relation, the right to hold property, the right to bring suit in court, the right to testify, freedom of speech and of the press, and the right to an equal education. *See* 1 B. Schwartz, *supra,* at 72–74. Such a result would be inconsistent with the explicit or implicit rationale of many Supreme Court cases dealing with these rights. The Court would not have had to incorporate the First Amendment in the Fourteenth to make it applicable to the States in, *e.g., Fiske v. Kansas,* 274 U.S. 380, 47 S.Ct. 655, 71 L.Ed. 1108 (1927), or *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), if the Thirteenth Amendment had already done so; nor in fact would state action be required for a First Amendment violation, see *Hudgens v. NLRB,* 424 U.S. 507, 513, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976), because the Thirteenth Amendment reaches private conduct. *See Griffin v. Breckenridge,* 403 U.S. 88, 104–05, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); *Jones v. Alfred H. Mayer Co., supra.* The Court's privacy decisions, *see* notes 9–10

and accompanying text *supra,* would have rested on the Thirteenth Amendment and not some combination or penumbra of the First, Third, Fourth, Fifth, Ninth, and Fourteenth Amendments, *see Griswold v. Connecticut,* 381 U.S. 479, 484–86, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); and, perhaps, there would have been no dispute over the equal funding of public school systems. *See San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Moreover, appellants' absolutist view of the Thirteenth Amendment would render largely superfluous the Due Process and Equal Protection Clauses of the Fourteenth Amendment as well as the civil rights statutes now codified at 42 U.S.C. §§ 1981 *et seq.* We are appropriately reluctant to reach such a result. The Supreme Court has never considered that the "badges or incidents" went beyond those listed in the 1866 Civil Rights legislation, *viz.,* a lack of " 'the same right to make and enforce contracts, to sue, be parties, give evidence, and to inherit, purchase, lease, sell and convey property, as is enjoyed by white citizens.' " *Jones v. Alfred H. Mayer Co., supra,* 392 U.S. at 441 n. 78, 88 S.Ct. at 2204 n. 78, *citing The Civil Rights Cases, supra,* 109 U.S. at 22, 3 S.Ct. 18; *see Griffin v. Breckenridge, supra.*

■ As an additional matter, we point out the doubtful applicability of the second incident of slavery, upon which appellants rely, to the sealed records laws. Although it is doubtless true that an "incident" of slavery (in the original sense) was the abolition of the parental relation, *i. e.,* the offspring of a slave was deprived of the care and attention of parents, *see* 1 B. Schwartz, *supra,* the New York sealed records laws do not deprive appellants of their parental relation. It is the New York adoption laws themselves and not the sealed records laws that recognize the divestment by natural parents of their guardianship because of formal surrender, abandonment, or forfeiture by unfitness or jeopardy of the child's best interests; and it is the adoption laws that create a new parent-child relationship between appellants and their adoptive par-

ents. Appellants do not challenge the constitutionality of the adoption laws; thus their challenge to the sealed records laws, even if cognizable under the Thirteenth Amendment in the absence of congressional legislation, is misdirected. Appellants are left to their remedies under the New York statute or with the New York legislature.

Judgment affirmed.